Smith vs. The State.

---

NOAH SMITH, plaintiff in error, vs. THE STATE OF GEORGIA, defendant in error.

Where the only *witness in* the case, testifies falsely to a leading fact, respecting which there could be no mistake or misapprehension, being corroborated by another witness or circumstances, as to immaterial matters, will not restore the witness to credit, or to authorize a conviction upon the evidence of that single witness.

Indictment for Bastardy, in Henry Superior Court. Tried before Judge CABINESS, at April adjourned Term, 1857.

Noah Smith was charged, upon the affidavit of Seney F. Sears, with being the father of a bastard child, of which she was delivered, about the 27th of October, 1856.

A warrant was issued, which Smith superseded by appearing before the Justices of the Peace. After the usual preliminary examination, he was required by the Justices to give bond for the maintenance of the child, which he refused to do, whereupon he was bound in a bond of five hundred dollars for his appearance at the Superior Court, next to be held in said county, to answer said charge, and for refusal to give the bond for maintenance.

Upon the trial, the State introduced *Seney F. Sears*, the mother, who testified that she was not a married woman—was never married—that she gave birth to a bastard girl child, on the 27th of October, 1856, in the county of Henry. Noah Smith was the father of the child; it was begotten in Henry county. Witness is about twenty-two years old; has no property; is unable to support the child, which *is still* living.

Upon her cross-examination, witness stated in detail, the facts and circumstances attending the begetting of the child. The time, place and manner. The child was begotten about the first of February; the 4th day of the month; in the day-time; between breakfast and dinner, at the house of her grand mother, Mrs. Cochran; witness did not live there; was there on a visit; had been there a day or two before; her grand-mother was not at home; John Cochran was there; don't recollect seeing any one else; he, Cochran, is not married; 25 or 30 years old; did not remain there until she saw Smith; stayed nearly all day; her grand-mother was gone two or three hours, and then returned; she resided at Lovejoy's station; defendant was going to Cochran's store, and stopped in; there was snow on the ground; he asked witness if he might'nt, and she told him no; she was standing by the door; he pushed her into the room, and shut the door, and pulled her into his lap; he pulled up her dress and did what he asked to do; he then got up and went off; witness was standing by an inside door; she sat across his lap; she sat in his lap, with her face from him; he took hold of her

Smith vs. The State.

arm with one hand and pushed her to a chair to the other side of the room ; she did not sit very close to him ; can't say how far apart ; they were about the length of a hand apart ; he unbuttoned his pantaloons, after she was pulled into his lap ; took both hands to unbutton his pantaloons ; that was the first, last and only time witness ever had carnal connection with any one. Defendant pushed her into the room, and then let her go and shut the door ; she did not resist after she got into the room ; he pulled her into his lap ; did not resist then, nor when he pulled up her clothes ; told him to let her go ; did not try to get away ; there were beds in the room, and a window looking towards the road ; the road was tolerably near the house. John Cochran was at the house when defendant got there ; he went out directly afterwards ; defendant is witness' uncle ; she agreed to the act and enjoyed it with him ; Cochran left the house in about five minutes after defendant went in. Not long thereafter, in about five minutes, defendant proposed to have connection with her ; his house was about a quarter of a mile of Mrs. Cochran's ; Cochran went out to get wood ; he might have gone one hundred yards ; went to the new Church ; saw him go there ; he had got to the church before defendant took hold of her arm ; Cochran came back with wood, and threw it down and went after more ; she was in the room when he threw the wood down. Defendant stayed an hour at Mrs. Cochran's ; witness stayed some time in the room with defendant ; probably half an hour ; were about half an hour in connection ; her father had lived in that neighborhood four or five years ; she weighed about 150 pounds when last weighed ; did not weigh so much when defendant had connection with her ; perhaps weighed ten pounds less ; she was in good health ; had not worked out in the field that year ; had previously done so. She made affidavit before McConnell, two or three days after the child was born ; no one present but her father and McConnell. Smith, her father, Johnson, McConnell and Doyal, were present when the

Magistrates met. Mrs. McGuffin was at witness' house two or three days after the birth of the child; she spoke to witness; did not sit down by the bed and talk with witness; she asked witness who was the father of the child; witness replied she could not tell her; that was all she told her; did not tell her she did not know who was the father of the child; she did tell her that GOD knows who is the father of the child, she did not. At the trial before the Magistrates, at her father's house, did not say she did not know when the child was got; did not say she did not know whether it was in January or February; she said that it was in February; but she was pestered, and could not tell exactly the time; she now fixes the time from counting it up; counting from the 4th of February, it will be nine months in October; can't tell exactly the time; knows that it was the 4th of February when Smith was at her grand-mother's; told her mother what day she was at her grand-mother's, and she told her it was the 4th of February. At the trial before the Magistrates, she did not swear that she did her best all the time to keep Smith from doing it, but he would, and did do it in his lap; has sworn on this examination, that she did not resist, but consented and enjoyed it with him; she gave up to him; used no resistance; has talked to no one about it; has talked with the Solicitor General and Judge Floyd about this matter; understood the question to be, whether she had talked with any one before she came here; never talked with John Cochran about the matter.

*Examined in reply.*—Defendant sat on the edge of the chair; he said there was no harm in it, and had known the like done many a time; defendant's wife is sister of witness' mother, and of John Cochran; defendant's hands were under witness' clothes; Col. Doyal was present at the examination before the Magistrates, and cross-examined witness; she was very much excited; defendant lived in sight of Mrs. Cochran's; moved off in a short time.

*By Defendant.*—Defendant's hands were not on witness'

body behind, all the time; she was tolerably thinly dressed; during the half hour that witness and defendant were in connection, their bodies did not get nearer than six inches.

*The Justices* were examined as to the refusal of defendant to give bond for maintenance of the child.

*John Cochran*, testified, on the part of the State, that he is the brother-in-law of defendant, and uncle of Seney Sears. During the first of 1856, his mother lived about three hundred yards from defendant. Defendant was at his mother's the last of January or first of February; snow was on the ground; Seney Sears was there one time when Smith was there; thinks it was on Monday, a while after breakfast; witness was out getting wood; went into the house to warm; found no one in the house where the fire was; afterwards heard Smith talking in a room where there was no fire; he afterwards came out to witness and said he wanted Seney to go and see his wife before he moved away; two of the doors were shut; Seney was in the room with him; no other person was there; the outside door next the kitchen, and the partition door were shut.

*Cross-examined.*—Don't recollect seeing Smith when he came in; went opposite the meeting house, sixty or eighty yards from the dwelling house; it was very cold, as cold a day as any last winter; threw the wood down about 20 or 25 steps from the house; carried six or eight loads before he cut up the wood; cut it all up and then went into the house to warm; in 15 or 20 minutes he went out; Smith came out; had not seen Smith before he came out of the house that morning; Smith was not talking loud; not loud enough for witness to understand what he said; knew it to be his voice; mother had gone down to Smith's; when witness went off, thinks he left his mother and Seney in the house; don't think he was alone in the house with Seney, before he heard Smith in the house with her; talked with Dr. Jackson about some medicine for a young lady; it was late in August; never asked him about it but once; told him there was a cer-

tain young woman whose monthly courses had stopped, and asked him if such cases were dangerous; he said they were hard to cure, and he then had several cases; did not tell him who it was; don't think he asked witness who it was; the doctor did not refuse to furnish the ergot unless the name was disclosed; it was Seney Sears who was sick; never talked to any one about it; after the child was born, talked with some persons, Minter and Ed. Jackson about it; it was the next Sunday after the child was born; did not apply to Dr. Jackson but one time; if he did, don't recollect it. The application was made to him near his mother's house, a week or two after, and near the same place; did not make a second application, according to his recollection; don't think he applied for medicine; only talked about it; told him not to say anything about it; that he did not want to expose her; he understood the courses had stopped on her. Dr. Jackson never told witness that he would let him have the medicine if he would tell the young lady's name; was sworn before the committing Magistrates; don't think he swore that he went after but one load of wood; did not swear, that when Smith called he was sitting in the room with Seney Sears; did then swear that he did not see or hear anything improper in Smith; don't recollect swearing that he did not know that Smith was in the room or not; don't recollect whether such a question was asked; don't recollect swearing that Smith did not stay more than half an hour; don't recollect that the question was asked; thinks he was there about half an hour; don't recollect that the question was asked him if Smith and Seney Sears were in the room together.

*Rebuttal.*—Consulted Dr. Jackson, at his mother's request; never named such a thing as having carnal intercourse with Seney Sears in his life; is not the father of the child; defendant reqested witness to swear that he, witness was in the house all the time that he was there; if he would only say so, it would clear him.

Smith vs. The State.

*Sur-rebuttal.*—In reply to the question, if defendant did not request him to swear that witness was in the house all the time that he, Smith, was or nearly so, because such was the truth, witness answered that defendant gave no such reason for the request, when he made it; witness' mother is 74 or 75 years old; she walked down to Smith's; he never had any conversation with Seney Sears about her condition; is not the father of Seney Sears' child; if he was, would acknowledge it.

The State here closed.

Defendant introduced no testimony.

The Court, among other things, charged the jury, that swearing falsely in one particular, was not conclusive evidence that the whole testimony of the witness was false, but that the jury might, if the witness was corroborated by other witnesses or by circumstances, give the testimony such credit as they might think it entitled to. And refused to charge, in round terms, that if a witness swears falsely in one particular, it is sufficient to discredit his whole testimony.

The Court further charged, that if a witness makes a mere mistake in giving testimony, such mistake would go to impeach the memory of the witness, but if a witness should swear wilfully and corruptly false, in one particular, that would be sufficient to discredit his whole testimony, unless supported by another witness or corroborating circumstances.

The jury found the defendant guilty.

Whereupon his counsel moved for a new trial.

1st. Because the Court erred in the charge and refusal to charge above stated.

2d. Because the jury found without evidence, and contrary to evidence.

3d. Because the verdict was decidedly and strongly against the weight of evidence.

The Court overruled the motion for a new trial, and defendant excepted.

Counsel for defendant moved an arrest of judgment, because the indictment does not distinctly and substantially charge defendant with being the father of the child.

The Court overruled the motion, and Counsel for defendant excepted.

Counsel disagreeing as to the whole testimony of Seney F. Sears, Counsel for defendant proposed to prove by the bystanders who heard her testify, that among other things, she swore "that her body was not any time nearer than six inches to the defendant's belly, during the illicit connection." The Judge refused to hear the evidence, but preferred to rely upon his notes and memory, and not upon the recollection of others, and counsel for defendant excepted.

Doyal & Nolan, for plaintiff in error.

L. R. Daniel, Sol. Gen., *pro. tem.*, for the State.

*By the Court.*—Lumpkin, J. delivering the opinion.

Amongst other things, the Court charged the jury in this case, "that if a witness should swear wilfully and corruptly false in one particular, that would be sufficient to discredit their whole testimony, unless supported by another witness or corroborating circumstances."

Now, this charge may be abstractly right, but how does it stand as applied to the proof in this case? Why, it means this, that notwithstanding Miss Sears may have *perjured* herself as to a most material fact, swearing as she did before the committing Magistrates, that she resisted to the utmost of her ability, and on her present examination, that she consented and participated in the guilty pleasure; still, if she was corroborated by John Cochran, as to the circumstance of Smith's being there that day, and that he heard them talking in the room together when he returned from getting wood, that her credit might be considered as restored.

We are aware of the difficulty of prescribing a fixed rule

upon this subject.   All the discrepances which occur in giv-
ing in testimony, are to be carefully attended to.   The nov-
elty of their situation, the agitation which accompanies it,
the cajolery or intimidation to which witnesses are subjected
by Counsel; these and other causes, may occasion mistakes,
*and perhaps satisfactorily account for them*; but should a wit-
ness swear wilfully and corruptly false to a leading fact about
which there could be no unintentional error, as for instance,
whether the act in this case, was done with or without the
consent of the party, and her testimony was simply corrobo-
rated, as to an immaterial point, for myself, I could not
convict upon such evidence.   Who could render a verdict
upon such proof, and entertain no reasonable doubt as to
the guilt of the defendant ?   I might not altogether reject the
testimony as utterly untrue.   But the result must necessarily
be, that it was so far invalidated as to force me to aquit the
accused, for want of reliable proof.

   We shall remand this cause for a re-hearing.   The de-
fendant, it is admitted, is three score years old.   He has been
convicted of an unnatural crime, incestuous bastardy, upon
the person of his neice, and that by the testimony of a single
witness, who contradicts herself as to a main fact, about
which there could be no misconception.   Besides, the cir-
cumstances attending this connection, as testified to by this
young woman, although not impossible, are certainly very
unusual, and consequently improbable, to say the least of it.
The English law anciently held, that pregnancy could not
follow rape, and that therefore, its presence destroyed the
validity of the accusation.   But *Hawkins, Hale & East* held
that such is not the law, because the opinion in which it was
founded, was false in fact, and that impregnation may
take place where there is a great repugnancy on the part of
the female, amounting even to a virtuous recoil or a sense of
honor at the time.   We shall probably never know what is
necessary to cause conception.   We are willing to concede
that the law of constitutional orgasm or the excitation of

the sexual passion may be such as that females may conceive without their knowledge, while under the influence of narcotics, intoxication or asphyxia, or even while asleep, if you please, (see *Dr. Gooch's lectures on midwifery, p.* 81) still we apprehend the case is rare where a *virgin* has been begotten with child; "the coldest day of the winter," "with snow on the ground:" "in a room without fire;" where there has been only a single *coitus*, seated in the lap of her ravisher or seducer, with her back to him; we repeat, that while such an instance may be barely within the bounds of possibility, it is exceedingly improbable to say the least of it; certainly no such case is reported in the *Causes Celebres*, or related by any writer on medical jurisprudence; and yet, such is the mode and manner of the illicit intercourse which took place between Miss Sears and her uncle, as sworn to by herself.

This case had best undergo another trial; Counsel differ materially as to the true meaning of a material portion of the bill of exceptions, and we find ourselves unable to say which is the proper reading. We are rather inclined to hold with the attorney for the plaintiff in error, and that would involve the witness, Miss Sears, in additional discredit in saying to Mrs. McGuffin, after the birth of her child, that "God knew who its father was, *she did not*."

This deed is alleged to have been done at the house of Mrs. Cochran, the grand-mother of Miss Sears, where she was visiting at the time, and where there was a single uncle living, twenty-five or thirty years old, who, in the month of August, when she was far advanced in pregnancy, talked with Dr. Jackson about getting some ergot to relieve the obstruction of the monthly courses of a certain young lady, admitted on his examination in open Court, to have been Miss Sears, but which application was concealed until after the birth of the child. A second trial might reflect some further light upon this transaction. Justice, we are satisfied, requires that a new trial be granted.

Judgment reversed.